IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT VARNEY, | : | |
| Plaintiff | : | Civil Action 2:09-cv-576 |
| v. | : | Judge Frost |
| TERRY COLLINS, *et al.*, | : | Magistrate Judge Abel |
| Defendants. | : | |

**REPORT AND RECOMMENDATION**

Plaintiff Vincent Varney, an inmate at the Ross Correctional Institution,

brings this action under 28 U.S.C. §1983 against the Director of the Ohio

Department of Rehabilitation and Correction, the Chief of the Ohio Adult Parole

Authority ("OAPA"), and the members of the OAPA, in their official capacities.  He

alleges violations of the Ex Post Facto Clause and of his substantive and procedural

due process rights guaranteed by the Fourteenth Amendment to the United States

Constitution.  This matter is before the Magistrate Judge pursuant to Defendants'

April 14, 2010 motion for summary judgment (Doc. 21).

## I.    Allegations in the Complaint

In September 1993, Plaintiff was convicted of attempted murder, kidnapping,

and rape, all of which were felonies of the first degree under Ohio law.  Compl. ¶ 8.

On September 23, 1993, he was sentenced to serve an indeterminate term of

1

imprisonment for a term of not less than ten years nor more than twenty-five on each count, concurrently, with a three-year gun specification. *Id.* ¶ 9.

In 1996, the Ohio General Assembly enacted sections §§ 5120.60, 5149.10, and 5149.101 of the Ohio Revised Code. These significantly, and retroactively, changed the procedures and regulations regarding prisoners eligible for parole, and created an office of victims' services. In 1998, the OAPA promulgated new parole eligibility guidelines pursuant to these statutes. *Id.* ¶¶ 10-12. These new guidelines placed prisoners into categories; Plaintiff was placed in Category 10. *Id.* ¶ 13.

Under the prior statute, Plaintiff became eligible for parole after serving nine years and eight months. However, the new statutes and guidelines increased the time before his parole eligibility. In June 2003, Defendants, applying the new rules, continued his parole hearing for sixty-three more months. *Id.* ¶ 13. This, Plaintiff states, effectively raised his minimum parole eligibility to fifteen years. *Id.* ¶ 14. In March 2006, Plaintiff was given an "*Ankrom* hearing" pursuant to *Ankrom v. Hageman*, 2007-Ohio-5092 (Ohio App. 2007). However, he was told by one of the members of the OAPA that no changes to the former decision would be made and that he should not even be having an Ankrom hearing. *Id.* ¶¶ 15-16.

At his July 2008 parole hearing, Defendants applied more recent 2007 parole guidelines. *Id.* ¶ 17. They denied him parole, and continued his parole hearing for a further sixty months. The complaint alleges that the retroactive application of the 2007 guidelines placed him in category 11, and he will have served 240 months

before being considered for parole again. ¶ 18.  According to the complaint,

Defendants' actions constitute willful violations of the Ex Post Facto Clause and the

substantive and due process rights afforded by the Fourteenth Amendment.

## II.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there

are no genuine issues of material fact, which may be accomplished by

demonstrating that the nonmoving party lacks evidence to support an essential

element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart*

*v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  To avoid

summary judgment, the nonmovant "must do more than simply show that there is

some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8

F.3d 335, 340 (6th  Cir. 1993).  "[S]ummary judgment will not lie if the dispute

about a material fact is 'genuine,' that is, if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed

in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 150 (2000) (concluding that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence).  In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations [...] but [...] must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324.  Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party.  *Anderson*, 477 U.S. at 251; *see Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

III.   Analysis

A.   Due Process

Plaintiff claimed in his complaint that Defendants violated his right to due process by enforcing new Ohio statutes which involved victims' rights advocates in parole decisions and which denied inmates the right to be present during full parole board hearings, and in increasing his minimum eligibility for parole by applying the new 1998-2007 parole guidelines.  A plaintiff bringing a § 1983 claim for violation of his right to procedural due process must show that the state deprived him of a constitutionally protected interest in life, liberty, or property without due process of law.  *Zinermon v. Burch*, 494 U.S. 113 (1990). Under the Fourteenth Amendment, the state may not interfere with a constitutionally cognizable liberty or property

interest without due process of law.  *Kentucky Dep't. of Corr. v. Thomps*, 490 U.S.

454, 460 (1989). The United States Supreme Court, however, has held that there is

no constitutional right of a convicted person to be paroled before the expiration of a

valid sentence.  *Greenholtz v. Inmates of Neb. Penal and Corr. Complex,* 442 U.S. 1,

7 (1979).  The Sixth Circuit Court of Appeals has held, in *Michael v. Ghee*, 498 F.3d

372, 378 (6th Cir. 2007), that the state of Ohio has created a completely

discretionary parole system, and, as a result, an Ohio inmate has no liberty interest

in parole eligibility under Ohio law.  Because Plaintiff has no protected liberty

interest in being released on parole prior to the expiration of his sentence, his right

to due process has not been infringed by Defendants.  Where no liberty interest is at

stake, Plaintiff is not entitled to due process.

However, Plaintiff asserts that *Michael* addressed only challenges to

conditions of confinement, applying an "atypical and significant hardship" standard

to such challenges.  He argues that *Sandin v. Conner*, 515 U.S. 472 (1995),

identifies two different areas of inquiry into a right to due process, (1) an increase in

sentence, and (2) conditions of confinement:

> In light of the above discussion, we believe that the search for a
> negative implication from mandatory language in prisoner regulations
> has strayed from the real concerns undergirding the liberty protected
> by the Due Process Clause. The time has come to return to the due
> process principles we believe were correctly established and applied in
> *Wolff* and *Meachum*.  Following *Wolff*, we recognize that States may
> under certain circumstances create liberty interests which are
> protected by the Due Process Clause. *See also Board of Pardons v.*
> *Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987). But these
> interests will be generally limited to freedom from restraint which,
> while not exceeding the sentence in such an unexpected manner as to

5

> give rise to protection by the Due Process Clause of its own force, *see, e.g., Vitek*, 445 U.S., at 493, 100 S.Ct., at 1263-1264 (transfer to mental hospital), and *Washington*, 494 U.S., at 221-222, 110 S.Ct., at 1036-1037 (involuntary administration of psychotropic drugs), nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Sandin*, 515 U.S. at 483-484. *Michael* relied upon this, according to Plaintiff, in analyzing only whether denial of parole represented prison conditions imposing an "atypical and significant hardship" upon an inmate. Plaintiff asserts that *Sandin* also, however, permitted an alternative inquiry into whether regulations "exceeding the sentence in... an unexpected manner" gave rise to a Due Process Clause challenge, and states that he wants the Court to address his claims in this light. (Doc. 29 at 4.)

However, Plaintiff is mistaken. Although the *Sandin* Court recognized that there could be an extraordinary imposition upon an inmate "exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force", the cases it cited to illustrate this principle indicate that it meant treatment of prisoners outside the ordinary relationship between prison and inmate. It cited *Vitek v. Jones*, 445 U.S. 480 (1980), in which a state law gave a prison physician the power to, at his discretion, involuntarily commit a prisoner to a mental hospital. *Vitek* (specifically noting in passing that there is no inherent constitutional right to parole) found a separate liberty interest in a prisoner not being transferred to a mental hospital without a hearing as to whether he suffered from mental illness. *Id*. at 488-492. The Court also cited *Washington v. Harper*,

494 U.S. 210 (1990), in which it held that inmates in a state which had set a policy

permitting treatment of nonconsenting prisoners with antipsychotic drugs only

where they had been found to be mentally ill and dangerous had a liberty interest

in avoiding the unwanted administration of drugs.  These cases did not address

ordinary penological matters such as the length of sentences or eligibility for parole.

Sandin, therefore, did not create a different "first due process inquiry"

relating specifically to sentences, but rather recognized an exception in certain

circumstances to the general rule that liberty interests are limited to freedom of

restraint from conditions creating an atypical and significant hardship.  Moreover,

the court in Michael did not, contrary to Plaintiff's assertions, determine whether

denial of parole represented such conditions.  It specifically rejected the suggestion

that this proposed method of analysis was relevant to parole eligibility, rather than

the prison conditions addressed in Sandin.  It also reiterated the long line of

caselaw holding that there is no constitutional right to parole eligibility in a state

with a completely discretionary parole system.  Michael, 498 F.3d at 377-78, citing

Swihart v. Wilkinson, 209 Fed.Appx. 456 (6th Cir. 2006).  Plaintiff's claims here

that new parole guidelines or victims' rights statutes violate due process likewise

fail for lack of a protected constitutional right.[1]

---

[1]  Defendants, in their motion for summary judgment, identified that Plaintiff
may be arguing that Defendants violated the Due Process Clause by failing to
provide him with a fair and neutral decision maker.  They cited Tamachaski v.
Renico, 2001 WL 1478664 (E.D. Mich. 2001), in which the court determined that, if
a prisoner were entitled to due process of law in the parole release decision making
process, that due process of law would be violated where parole board members

B. Ex Post Facto Clause

1. 1998 and 2007 Parole Guidelines

In *Michael v. Ghee, supra*, the Sixth Circuit Court of Appeals described

Ohio's new parole guidelines, enacted by Senate Bill 2:

> Under Ohio's former sentencing law, Ohio inmates were given an indeterminate sentence comprised of a minimum and a maximum sentence. An inmate became eligible for parole after serving his or her minimum sentence, minus credit for good behavior. Parole decisions were delegated to the Ohio Adult Parole Authority ("OAPA"). It determined when release was appropriate for each inmate. In 1995, Ohio adopted a new sentencing system for crimes committed after July 1, 1996. Under the new law, indeterminate sentences were abandoned in favor of fixed terms of incarceration determined by the defendant's presiding judge. The new system does not apply retroactively to Ohio inmates sentenced under the former sentencing scheme.
>
> In 1998, the OAPA adopted guidelines designed to guide the discretion of parole officers making release determinations for Ohio inmates sentenced prior to July 1, 1996. The guidelines are similar to the guidelines used by the United States Parole Commission, using two factors to determine how long a prisoner should be incarcerated before parole: (1) the seriousness of the inmate's crime, and (2) the "risk of reoffense," based on the inmate's prior criminal conduct and performance on probation and parole. The presumptive amount of time an inmate serves is determined by finding the intersection on a grid between the inmate's offense category and his or her risk of reoffense. Parole officials, however, retain discretion to depart from the guidelines, but may not retain an inmate beyond the maximum sentence.

*Id.* at 373-74 (citations omitted). The *Michael* court found that an inmate can

---

derived a direct pecuniary interest from decisions adverse to inmates or where parole board members engaged in both adjudicative and executive functions. *Id.* at *3-4. However, the *Tamachaski* court acknowledged that its analysis was hypothetical, because, as Michigan (like Ohio) had a discretionary parole system, prisoners were not entitled to due process of law in parole consideration decisions anyway. *Id.* at *2.

challenge the retroactive application of the 1998 Ohio guidelines where they create

a "sufficient risk of increasing the measure of punishment attached to the covered

crimes." *Id.* at 384, quoting *Garner v. Jones*, 529 U.S. 244, 250 (2000).

> Plaintiffs can satisfy this burden in one of two ways.  First, plaintiffs
> can establish an *ex post facto* violation if they can show that the
> guidelines, on their face, show a significant risk of increased
> incarceration.  Second, when the guidelines do not by their own terms
> show a significant risk, plaintiffs "must demonstrate, by evidence
> drawn from the [guideline's] practical implementation by the agency
> charged with exercising discretion, that its application will result in a
> longer period of incarceration than under the earlier [guidelines]."

*Michael*, 498 F.3d at 384, quoting *Garner*, 529 U.S. at 255.  However, the "focus of

the ex post facto inquiry is not on whether a legislative change produces some

ambiguous sort of 'disadvantage', [...] but on whether [the] change [...] increases the

penalty by which a crime is punishable." *Cal. Dep't of Corr. v. Morales*, 514 U.S.

499, 506 n.3 (1995).  *See also Foster v. Booker*, 595 F.3d 353, 362 (6th Cir. 2010).

Ohio's parole system grants considerable decision-making discretion to the

parole board.  Instead of a deterministic scheme compelling certain results based

upon a particular crime and particular time served, it instructs the parole board in

what factors it shall take into account, and then grants it the authority to make its

own determination as to whether an inmate should not be released.  One such

possible determination is that "[t]here is substantial reason to believe that due to

the serious nature of the crime, the release of the inmate into society would create

undue risk to public safety, or that due to the serious nature of the crime, the

release of the inmate would not further the interest of justice nor be consistent with

the welfare and security of society." O.R.C. §5120:1-1-07(A)(2).  In *Foster v. Booker*,

the Sixth Circuit Court of Appeals addressed a similar challenge to Michigan's

parole system, which had changed in 1992 to implement tougher standards such as

less frequent hearings.  The *Foster* court found, however:

> To the extent that plaintiffs have shown they face a significant risk of
> increased punishment under the new parole regime, plaintiffs have not
> shown that this risk is attributable to statutory changes to the parole
> process and not to a change in the way the Board legitimately
> exercises its discretion.  The decision whether to grant parole has
> always been within the Board's discretion. [...]
>
> Despite the fact that the scope of the Board's discretion has remained
> the same, plaintiffs argue that, in practice, the new Board applied a
> harsher standard than the old Board when deciding whether to grant
> parole.  However, plaintiffs' contentions do not make out an ex post
> facto violation.
>
> If the Parole Board decided within its discretion to get tougher, that
> could hardly amount to an ex post facto violation as long as it was
> within the Parole Board's discretion to get tougher.

595 F.3d. at 362.

Plaintiff argues that he can show both that the 1998-2007 guidelines, on their

face, show a risk of increased incarceration, and that he can demonstrate by

evidence drawn from their practical implementation that their application will

result in a longer period of incarceration than under the earlier guidelines.

*Michael*, 498 F.3d at 384.  As to the second argument, though, he has made no such

demonstration.  Instead he has argued, in essence, that the guidelines speak for

themselves.  (Doc. 29 at 8.)  This simply leads back to the question of whether the

new regulations show such a risk on their face.

The 1998-2007 guidelines, Plaintiff argues, abolished the former "matrix" system whereby a correlation between the inmate's offense and factors such as his criminal history indicated to the parole board whether and when an inmate would typically be released. (Doc. 29-1 at 3-4.) Instead, they established "categories" with tougher minimum parole eligibilities. (Doc. 29 at 5.) Varney argues that it is clear on the face of these new guidelines that their retroactive imposition shows a risk of his increased incarceration.

However, the 2008 decision of the Ohio Parole Board makes it plain that it did not deny him parole because it had been compelled to do so by new regulations establishing a longer minimum parole eligibility, or because he fell into a specific category. The decision noted that Plaintiff's institutional conduct had been "fair", and that his institutional programming had been "good". It recommended that his parole hearing be continued for sixty months, however, due to the nature of his rape, kidnapping, and attempted murder offense, and because "[t]o release him at this time would demean the seriousness of these offenses and would place society at high risk for harm." (Doc. 21-2 at 3-4.) It was, under Ohio's system, within the discretion of the parole board to make this decision, whether or not the 1998-2007 guidelines were in place and regardless of what category Plaintiff had been classified into. Statutes and guidelines enacted after Plaintiff committed his offenses which left discretion as to whether to parole prisoners up to the parole board do not show on their face a significant risk of increased incarceration, because the ultimate authority to grant or not to grant has not changed. *Foster*.

## 2. Victims' Rights Statutes

Plaintiff argues also that O.R.C. §§ 5120.60, 5149.10, and 5149.101 violate the Ex Post Facto Clause. These statutes generally created an office of victims' services within the Ohio Department of Rehabilitation and Correction's division of parole and community services, provided that experience advocating for the rights of victims of crimes was a qualification for serving on the Ohio Parole Board, and gave certain crime victims, their families, and their representatives certain rights to request, and be heard at, full parole board hearings. Plaintiff first asserts, without elaboration, that the retroactive application of these laws should be considered presumptively violative of the Ex Post Facto Clause, because they did not exist at the time of his offenses. (Doc. 29 at 10.) Plaintiff offers no rationale, however, for *why* these laws should be considered presumptively unconstitutional simply because they were passed later.

More specifically, Plaintiff challenges O.R.C. § 5149.10. This provides, in relevant part:

> (A) ... Except as otherwise provided in division (B) of this section, no person shall be appointed a member of the board who is not qualified by education or experience in correctional work, including law enforcement, prosecution of offenses, advocating for the rights of victims of crime, probation, or parole, in law, in social work, or in a combination of the three categories.
>
> (B) The director of rehabilitation and correction, in consultation with the governor, shall appoint one member of the board, who shall be a person who has been a victim of crime or who is a member of a victim's family or who represents an organization that advocates for the rights of victims of crime.

12

Plaintiff initially misunderstands subsection A to mean that every member of the board must be "qualified by education or experience in... advocating for the rights of victims of crime."  The statute, as written, provides that members of the board must be qualified in correctional work, law, or social work.  It includes amongst "correctional work" various types of such work, one of which is "advocating for the rights of victims of crime".  However, the statute does not require that *every* member of the board be qualified in correctional work, but rather in at least *one* of "the three categories" of correctional work, law, or social work.  Moreover, the inclusion of the word "or" between "probation" and "parole" indicates that persons are not considered qualified in "correctional work" because they have experience in *all* of those kinds of work, but because they have experience in at least *one* of them.

Nevertheless, Plaintiff takes exception with subsection B as well, on grounds that having even one such person on the board deprives him of his right to an impartial parole tribunal.  The Court rejects this reasoning.  Including victims of crime or their advocates on the parole board is not the same thing as removing the parole board's discretion as to what ultimate decision it will reach.  As the court found in *Foster*, *supra*, a change in the composition of the parole board that results in the board's decision "within its discretion to get tougher" is not an *ex post facto* violation.  "[A] law that is merely procedural and does not increase a prisoner's punishment cannot violate the Ex Post Facto Clause even when applied retrospectively." *Partridge v. Davis*, 2007 WL 2852340 (E.D. Mich. Sept. 30, 2007), citing *Barna v. Travis*, 239 F.3d 169, 171 (6th Cir. 2001).  This Court has so held

13

before. *Ridenour v. Collins*, 692 F.Supp.2d 827, 854 (S.D. Ohio 2010); *Clumm v. Warden, Chillicothe Corr. Inst.*, 2008 WL 4346797 (S.D. Ohio Sept. 18, 2008). Moreover, as addressed above, providing the parole board additional factors to consider in making its judgment is not the imposition of an *ex post facto* law. The "focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of 'disadvantage', [...] but on whether [the] change [...] increases the penalty by which a crime is punishable." *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995). Plaintiff's claims that the new statutes would "place biased and prejudiced persons on the Board" are too ambiguous a disadvantage to create a genuine issue of material fact as to a risk of increased punishment.

## IV.    Conclusion

For the reasons stated above, the Magistrate Judge **RECOMMENDS** that Defendants' April 14, 2010 motion for summary judgment (Doc. 21) be **GRANTED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.

*Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); Miller v. Currie, 50 F.3d 373, 380 (6th Cir. 1995).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).


                                        s/Mark R. Abel
                                        United States Magistrate Judge